IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 2, 2022

## IN RE BRALYNN A.

**Appeal from the Juvenile Court for Montgomery County**
**No. 21-JV-93          Tim Barnes, Judge**
_____

### No. M2021-01188-COA-R3-PT
_____

Mother appeals the termination of her parental rights, arguing that the proof was less than clear and convincing that termination was in her child's best interest. Because we conclude that the trial court did not err in finding clear and convincing evidence of three grounds for termination and that termination is in the child's best interest, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Ashley N.

Herbert H. Slatery, III, Attorney General and Reporter; Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") first became involved with Respondent/Appellant Ashley N.[1] ("Mother") in April 2019 when it received a referral that Mother's son, Bralynn A., born in September 2016, was drug exposed and lacked supervision. As a result, DCS filed a petition to declare the child dependent and neglected on April 22, 2019 in the Montgomery County Juvenile Court ("the juvenile court" or "the trial court"). The petition alleged that the child's father had

---

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

overdosed and had to be taken to the hospital; although he had been released, a drug screen administered on April 3, 2019, showed that he was positive for oxycodone, amphetamine, and benzodiazepine.[2]  Around that time, Mother had been arrested on outstanding warrants and was still incarcerated. The child was safety-placed with a relative after Mother agreed to an immediate protection agreement. Still, DCS did not ask to remove the child from his parents' custody, but that the immediate protection agreement be incorporated into the trial court's order. Following a preliminary hearing, the trial court found probable cause that the child was dependent and neglected and made the immediate protection agreement part of its order. DCS created a non-custodial permanency plan for both parents at this time.

The child remained in his parents' custody until June 2019, when Mother tested positive for benzodiazepines and could not produce a valid prescription. Although Mother completed an alcohol and drug assessment following this positive drug screen, she claimed during the assessment that she did not use drugs. But a second drug screen associated with the assessment was again positive for benzodiazepines. And the child's relatives could no longer care for him.

So, on August 27, 2019, DCS filed an amended petition for dependency and neglect in which it asked for physical and legal custody of the child. The petition recited, inter alia, Mother's incarceration and positive drug tests as the basis for the dependency and neglect action. The child was then removed via a protective custody order and adjudicated dependent and neglected as alleged in the petition after Mother waived the preliminary hearing. A second adjudicatory hearing was held on December 3, 2019, in which the child was again found to be dependent and neglected based on drug exposure by Father and Mother's unavailability due to incarceration. DCS placed the child in a foster home, where he has remained throughout the pendency of this case.

Five permanency plans were created by DCS after the child was removed. Under the first plan, Mother was required to (1) resolve all legal issues, provide proof to DCS, and follow all rules of probation; (2) complete a non-self-reporting clinical assessment with both an alcohol and drug component and a parenting component, follow all recommendations, and sign a release of information for and provide proof to DCS; (3) attend supervised visits appropriately; (4) not allow illegal activities in the home; and (5) obtain and maintain stable housing, provide proof of housing and allow DCS to do walk-throughs; and (6) pay child support. The second plan maintained mostly the same requirements, with Mother being required to comply with the aftercare that was recommended following her alcohol and drug assessment, complete a parenting assessment, and provide proof of legal employment to DCS. The third plan again maintained the same requirements except that it had specific instructions as to what snacks Mother could bring the child during visitation. At this point, Mother's supervised visits

---

[2] The child's father passed away in May 2021. As such, we only refer to him as is necessary for a full recitation of the facts.

were changed to unsupervised visits for four hours every other Saturday.

As discussed in detail, *infra*, Mother tested positive for drugs after the third plan was created. The plan was therefore amended in late October 2020 to add adoption as a goal. Mother's visitation was also reduced to supervised only based on an agreed order, and Mother was directed to participate in family therapy with the child. A final permanency plan was created in March 2021. In addition to prior requirements, Mother was required to complete a new assessment and psychological evaluation, to participate in individual therapy and medication management, to participate in an intensive outpatient program, and to obtain stable housing as Mother had been living in hotels.

Eventually, DCS filed a petition to terminate Mother's parental rights on February 1, 2021. The petition alleged as grounds abandonment by failure to support, persistence of conditions, substantial noncompliance with permanency plans, and failure to manifest a willingness and ability to personally assume legal and physical custody or financial responsibility of the child. Trial occurred on August 30, 2021. Only Jamin Pena, a DCS team leader, and Mother testified. According to Ms. Pena, Mother completed some tasks on her permanency plans, but not all. Initially, Mother did complete a clinical assessment with an alcohol and drug component, allowed a walk-through of her home,[3] visited appropriately with the child, and she attended a recommended chemical awareness education class. Later, Mother also completed a parenting assessment. But Mother never provided DCS with any proof of a legal source of income, failed to consistently participate in drug screenings, did not pass all drug screenings that were administered, failed to participate in individual therapy as recommended during assessment, failed to participate in a recommended intensive outpatient drug treatment program, lied during an assessment about her drug and alcohol use, obtained new legal charges, and failed to be appropriate in visits later in the case resulting the termination of visitation.

Ms. Pena testified that Mother would often test positive for drugs during the pendency of the case. For example, as previously stated, after the third permanency plan was created, in September 2020, Mother testified positive for hydrocodone. Then in a test administered on October 8, 2020, Mother tested positive for hydrocodone, oxycodone, amphetamines, and ethanol. According to the fourth permanency plan, Mother did produce a prescription for amphetamines following this screen; however, as discussed in detail *infra*, DCS came to believe that this prescription was falsified. Ms. Pena testified that DCS's concerns over Mother's drug use had not abated, as Mother continued to test positive even in the month before trial. Specifically, Ms. Pena submitted reports from a July 21, 2021 urine drug screening positive for benzodiazepines and amphetamine, as well

---

[3] Mother shared this home with the child's father, but later vacated this home due to a no-contact order, discussed *infra*. During this time, Mother was living a transient lifestyle. After the death of the child's father, Mother returned to this home, but did not request that another walk-through be conducted, given that DCS had already approved this home.

as a July 30, 2021 hair screening positive for amphetamine. And Ms. Pena testified that Mother never provided DCS with any prescriptions for those drugs.

Mother denied that she was still using illegal drugs. Specifically, Mother claimed that she had provided DCS proof of a prescription for both Adderall and Xanax. When asked if Mother could produce a prescription at trial, she stated that she could "get it." No prescription of any kind was submitted as proof. Mother admitted that she had taken one Xanax before trial, after the trial court questioned her slurred speech.

After Mother's positive drug screens in the fall of 2020, Mother was directed to participate in intensive outpatient treatment; she attended two sessions (out of the sixteen required) before stopping the treatment. Ms. Pena testified that Mother also did not participate in the individual therapy that was recommended as a result of the assessments. Although she began the therapy, she had missed many appointments and was no longer participating in any therapy. Mother claimed, however, that she was still attending therapy; she provided no documentary proof to support her claim.

Mother was ordered to pay child support of $20.00 per month following the removal. In January 2021, she made one payment of $50.00. In May 2021, she made another payment of $24.00. Although Mother claimed that she was self-employed throughout this custodial episode, Ms. Pena testified that Mother never provided any documentation to DCS of this fact. At trial, Mother disagreed, but admitted that she was not currently employed but had a job interview for a new position the week of trial. Mother claimed that she did pay child support when she was able, but testified that she could not pay support consistently for Bralynn because after paying her expenses for her home and three other children, she had no additional funds.[4] Mother admitted, however, that she had paid "several" bond payments in the year before trial and specifically, that someone had paid to bond Mother out of jail on a $10,000.00 bond in May of 2021.

Mother's criminal history was also at issue. As previously discussed, DCS became involved with the child while Mother was incarcerated. Mother was later briefly jailed in November 2020,[5] pleaded no contest to a charge of simple possession of a controlled substance, and has been arrested for violating her probation. Indeed, Ms. Pena testified that Mother has criminal charges pending for driving on a revoked license, which Mother admitted she lost when she had an accident and did not have insurance, which she could not afford at that time. Mother testified that she continues to drive without a license if necessary.

---

[4] This was the only mention of Mother's other children at trial.
[5] The testimony is unclear as to the basis for the arrest, but it may relate to domestic violence, as Ms. Pena testified that Mother could not return to the home with the child's father "because there was a no-contact order in place between them because of the domestic."

Mother was initially allowed supervised visitation with the child, which went well other than minor issues regarding the snacks that Mother brought. In fact, Mother progressed to unsupervised visitation. But after Mother's positive drug screen in the fall of 2020, visitation was again ordered to be supervised. After visitations, however, the child would act out and have behavior issues.[6] By January of 2021, visitation stopped completely. Specifically, the child's therapist recommended that visitation cease due to Mother arriving late for visits, Mother being inconsistent, and Mother failing to participate in family therapy with the child. So the juvenile court ordered that there be no contact between Mother and the child. After the cessation of visitation, Ms. Pena testified that the child's "whole character [] changed" in a positive way; his behavior improved, and he made considerable progress in therapy.

Indeed, Ms. Pena testified that the child had made "tremendous progress" while in his pre-adoptive foster home. He refers to his foster parents as "Mom" and "Dad"; he is bonded to his foster parents and his foster siblings; he attends daycare and is developmentally on track, while still participating in therapy. Ms. Pena conceded, however, that Mother loves her child.

At the conclusion of the trial, the trial court orally ruled that DCS provided clear and convincing evidence of three grounds for termination: persistence of conditions, substantial noncompliance with permanency plans, and failure to manifest a willingness and ability to personally assume legal and physical custody or financial responsibility of the child. The trial court found that DCS had not proven abandonment by failure to support. The trial court also considered the recently enacted twenty-factor test set forth in Tennessee Code Annotated section 36-1-113(i) to conclude that termination of Mother's parental rights was in the child's best interest. A written order memorializing the trial court's oral ruling was entered on September 13, 2021.[7] Mother thereafter appealed to this Court.

## II. ISSUES PRESENTED

---

[6] Ms. Pena conceded that this is typical for a child who is experiencing inconsistency in caretaker roles.

[7] The written order does not mention the ground of abandonment; nor does the written order expressly incorporate the trial court's oral ruling. In general, a trial court speaks through its written order, rather than a transcript. *See, e.g., Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015) ("It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders."). Because this ground appears to have been omitted from the written order by mistake and to have been abandoned by DCS, we will consider this appeal notwithstanding the failure to include findings as to this ground in the written order. *See* Tenn. R. App. P. 2 (allowing this Court to suspend the Tennessee Rules of Appellate Procedure for good cause); *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 559 (Tenn. 1990) (allowing the finality rule to be suspended under Rule 2); *see also In re D.M.*, No. M2002-01317-COA-R3-JV, 2003 WL 367240, at *2 (Tenn. Ct. App. Feb. 20, 2003) (noting that "expeditious handling of termination cases has become the public policy of this state").

As we perceive it, this appeal involves two issues:

1. Whether the trial court erred in finding clear and convincing evidence of grounds to terminate Mother's parental rights?
2. Whether the trial court erred in finding clear and convincing evidence that termination was in the child's best interests?

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citations and quotations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citations omitted). "The trial court's ruling that the evidence sufficiently supports

termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* at 524 (citation omitted).

## IV. ANALYSIS

## A. Grounds for Termination

Mother does not contest the grounds for termination in her appellate brief. We will nevertheless briefly address each of the grounds for termination found by the trial court. *See In re Carrington H.*, 483 S.W.3d at 525–26 (holding that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal"). The grounds at issue in this appeal are therefore: (1) persistence of conditions; (2) substantial noncompliance with permanency plans; and (3) failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility for the child.

## 1. Persistence of Conditions

DCS first relies on the ground of persistence of conditions, pursuant to Tennessee Code Annotated section 36-1-113(g)(3):

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Here, there is no question that the child was removed from Mother's custody in the

course of a dependency and neglect proceeding and had been removed for a period of longer than six months. Thus, the dispositive questions are whether conditions persist that prevent the safe return of the child, whether the conditions will likely be remedied at an early date, and whether the continued relationship prevents early integration of the child into a safe, stable, permanent home. As we have previously explained,

> A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016).

The trial court concluded that this ground was met because Mother continues to use illegal drugs, has not demonstrated a legal means of income, and continues to incur new criminal charges. The proof supports these findings. In particular, Mother tested positive for amphetamines on a hair drug screening administered on July 30, 2021, less than one month prior to the termination trial. Mother also tested positive for both amphetamines and benzodiazepines on a urine drug screening administered on July 21, 2021. Mother claimed, however, to have prescriptions for both Adderall and Xanax. According to Ms. Pena, however, Mother never produced a valid prescription for these drugs.[8] She also did not produce a valid prescription at trial.[9] As such, Mother's claims of having a valid

---

[8] At trial, an incident was discussed in which Mother and the child's father had produced a hospital prescription for a drug that they had tested positive for. DCS subpoenaed the hospital, however, which did not have a record of that prescription. As such, DCS concluded that the prescription was "obviously falsified."

[9] Mother's counsel stated at trial that he had "in front of me, on my computer here, a copy of a prescription which my client allegedly gave to DCS[.]" No prescription was actually admitted into

prescription lack any indicia of credibility.[10] Clearly, Mother's drug issues are not remedied, and are unlikely to be remedied at an early date. And continuing the parent-child relationship leaves the child in limbo, rather in a permanent status with a family that he is bonded with and that is pre-adoptive. The trial court did not err in finding clear and convincing evidence of this ground for termination.

### 2. Substantial Noncompliance with Permanency Plans

DCS next relies on the ground of substantial noncompliance with permanency plans pursuant to Tennessee Code Annotated section 36-1-113(g)(2). According to the Tennessee Supreme Court:

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed. 1990).

*In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), [DCS] must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn.

---

evidence. Mother's appellate counsel did not represent her at trial.

[10] In its oral ruling, the trial court specifically found that Mother lacked credibility on this issue. This express credibility finding was not included in the trial court's written order. Still, we give deference to a trial court's credibility finding whether express or implicit in a trial court's ruling. *See Lowe v. Smith*, No. M2015-02472-COA-R3-CV, 2016 WL 5210874, at *5 (Tenn. Ct. App. Sept. 19, 2016) (citing *Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008)) ("[T]he trial court's findings on credibility, whether express or implicit, are entitled to great deference on appeal."). Here, both the oral and written rulings make clear that the trial court did not believe Mother as to her claim that she was prescribed these medications. When "an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)). The record fully supports the trial court's finding that Mother lacked credibility on this issue.

Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*Id.* at 656–57.

Here, there is no serious question that the requirements of Mother's permanency plans were reasonable and related to remedying the issues that caused the child to be removed, particularly Mother's drug issues and her lack of stability.[11] There is also no genuine dispute that Mother complied with some requirements, while failing to complete others. The question then is whether Mother's noncompliance was substantial in light of the degree of noncompliance and the importance of the requirements not met. Under this metric, we conclude that Mother's noncompliance was substantial.

Mother's drug and criminal issues were central to the removal of the child. But these were the issues that Mother made little effort to remedy during the two years that the child had been in DCS custody. Mother failed to appear for several drug tests and often did not pass the ones administered to her. Although Mother completed various assessments and evaluations, Ms. Pena testified that she did not consistently go to the therapies or programs that were recommended as a result of the assessments. And even Mother's completion of assessments is undermined by the fact that she lied about her drug use during one assessment. Mother also failed to fully remedy her criminal charges, picking up new charges during the custodial episode and admittedly continuing to engage in criminal activity that has the possibility of placing her back in jail. Mother also simply refused to ever provide DCS with any proof that she had a legal income, nor did she pay child support as had been ordered. Under these circumstances, we must conclude that DCS demonstrated, by clear and convincing evidence, that Mother had substantially failed to comply with the permanency plans in this case.

### 3. Willingness and Ability

DCS next contends that Mother failed to manifest a willingness and ability, whether by act or omission, to personally assume legal and physical custody or financial responsibility of the child and that placing the child in her legal and physical custody would

---

[11] Mother's drug issues were cited in the first adjudicatory order finding the child to be dependent and neglected; Mother's unavailability as a result of incarceration was cited in the second adjudicatory order.

create a risk of substantial harm to the child's physical or psychological welfare. Tenn. Code Ann. § 36-1-113(g)(14). Essentially, the statutory ground has two distinct elements which must be proven by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child.' DCS must then prove that placing the child[] in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)) (some alterations of the original text removed). As for the first element, the petitioner must "prove[ ] by clear and convincing proof that a parent or guardian has failed to manifest either [an] ability or willingness" to parent the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).

The trial court made the following findings as to this ground:

> 24. [Mother] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. [Mother] quit her job on May 1, 2021 and has not been employed since that time. She has not had any demonstrable legal means of income since May 1, 2021. Further, [Mother] still has an issue with illegal drug use, and she has failed to resolve her legal issues.
> 25. Placing the child in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Placing the child with [Mother] would likely have a negative effect on the child's emotional, psychological and/or medical condition. The child is bonded and comfortable in his current placement. Further, the child's therapist recommended that the visitation between the mother and child cease due to the child's behaviors worsening after contact with the mother. To place the child with a mother who is struggling with a drug addiction would have a negative impact on the child's emotional and psychological condition.

We agree. Mother here presented no proof that she was not capable of employment. But she paid very little support for the child throughout the time he was in DCS custody and refused to provide DCS with any information concerning her employment. Mother also claimed that financial issues prevented her from paying support or having car insurance. But she testified that she would receive help if the child was returned to her. Still the proof shows that Mother did ask family or friends for help in bailing her out of jail on multiple occasions, while she declined to ask for help to pay support or, apparently, obtain car insurance. Thus, Mother has leaned on the charity of others in order to resolve the legal issues that result from her own poor decision-making, while declining to ask for help in

ways that could help her child. It therefore does not appear that Mother is willing or able to take financial responsibility for the child.

Importantly, Mother also continued to use drugs even until the month before trial. In fact, the trial court questioned Mother at trial concerning whether she was under the influence of narcotics due to her behavior. Thus, Mother is unable to take physical custody of the child.

We also agree that placing the child in Mother's legal and physical custody would create a risk of substantial harm to his welfare. *See* Tenn. Code Ann. 36-1-113(g)(14). With regard to substantial harm, this Court stated that:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *7 (quoting ***Ray v. Ray***, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)). Here, the proof shows that Mother continues to use illegal drugs and drive without a license, creating a likelihood that she will incur additional criminal charges. These issues have been held to create a risk of substantial harm for purposes of this ground for termination. *See **In re Brianna B.***, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) ("Or placing a child with a parent who engaged in repeated criminal conduct that required incarceration would put a child at risk of substantial physical or psychological harm. And parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm."). As such, there was clear and convincing evidence to support this ground for termination.

### B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." ***In re Navada N.***, 498 S.W.3d at 607.

In this case, the trial court considered the best interest factors contained in Tennessee

Code Annotated section 36-1-113(i), as it was amended on April 22, 2021. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. Under this version of the statute, courts are to consider a non-exclusive list of twenty best interest factors. We note, however, that the termination petition in this case was filed on February 1, 2021, well before the effective date of this amendment. "[T]he amended statute applies only to petitions for termination filed on or after April 22, 2021." *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022) *perm. app. denied* (Tenn. Mar. 17, 2022); *see also **In re C.T.***, No. E2021-01336-COA-R3-PT, 2022 WL 2236147, at *8 (Tenn. Ct. App. June 22, 2022). Still, this Court has held that there was no reversible error when the trial court relies on the wrong factors because the old factors are essentially contained within the new factors. *See **In re Da'Moni J.***, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022), *perm. app. denied* (Tenn. Apr. 1, 2022). Here, Mother does not raise any argument that the trial court considered the incorrect factors, but Mother's brief cites only to the nine best interest factors that were in effect at the time the termination petition was filed. We will therefore follow Mother's lead to consider the best interest factors that Mother asserts are controlling in this case.

According to the statute that Mother chooses to rely on, the best interest analysis is guided by the following non-exclusive factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively

providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2020). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted).

After citing the best interest factors and general law on this subject, Mother's entire argument as to best interest is as follows:

> Mother loves Bralynn. Mother is doing one-on-one therapy. Mother d[i]d several A&D assessments. Mother did some, but not all tasks on her permanency plan. Until visitation was suspended, Mother regularly visited Bralynn. Mother also completed a psych assessment.
> Mother did not complete all tasks, but she was making progress. While the progress was not perfect, it was moving in a positive direction. This Honorable Court should reverse the Trial Court.

(Record citations omitted).

Respectfully we cannot agree. Here, despite a multitude of assistance offered by DCS, Mother was still using drugs, still driving on a revoked license, and still had not demonstrated a legal means of income, even by the time of trial. Moreover, Ms. Pena disputed that Mother was currently participating in any recommended therapy. Thus, the proof shows that Mother had not made lasting changes that would make her home safe for the child. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2).

Moreover, although Mother did initially participate in visitation with the child, the visitations were terminated due to Mother's behavior and the negative effect of the visitation on the child. When visitation stopped, the child improved. Thus, the proof demonstrated that Mother had no meaningful relationship with the child and that her behavior and mental state negatively impacted the child. Instead, the child is well-bonded to his foster parents and would be harmed by being removed from their custody. *See* Tenn. Code Ann. § 36-1-113(i)(3), (4), (5), & (8).

The physical environment of Mother's home may be suitable; although she did not request a walk-through when she moved back into the home, a prior walk through of this home indicated no issues. But regardless of the suitability of Mother's physical environment, Mother's recent positive drug screens show that this home is not free from illegal drug use. And a suitable home means one that is free from illegal drug use. *See, e.g.,*

- 14 -

*In re Navada N*., 498 S.W.3d at 595 ("[A] suitable home requires more than a proper physical living location. It requires that the home be free of drugs and domestic violence." (quotation marks and citations omitted)). So this factor also favors termination. *See* Tenn. Code Ann. § 36-1-113(i)(7).

Thus, the relevant factors in this case clearly indicate that termination is in the child's best interest.[12] Here, Mother continues to test positive for drugs. While she claimed to have a valid prescription, she failed to bring any evidence to support that claim to the termination trial. And she had previously been found by DCS to have fabricated medical records to hide her illegal drug use. In contrast, the child is now in a safe and stable home that is pre-adoptive. He is bonded to his foster parents. Indeed, the cessation of visitation with Mother resulted in only positive effects on the child. Under these circumstances, clear and convincing evidence demonstrated that it was in the child's best interest for Mother's rights to be terminated.

## V. CONCLUSION

The judgment of the Montgomery County Juvenile Court is affirmed, and this cause is remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant, Ashley N., for which execution may issue, if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[12] The trial court found that factor (N)——regarding "[w]hether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult"—was inapplicable. This factor is substantially similar to factor (6) in the applicable factors. DCS does not argue that this factor favors termination. Therefore, at best, a single factor in this case weighs against termination.